IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 15, 2019 Session

**TIMOTHY ROY BOZZA v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2010-C-2636     Cheryl A. Blackburn, Judge**

_____

**No. M2018-01607-CCA-R3-PC**

_____

The petitioner, Timothy Roy Bozza, appeals the denial of his petition for post-conviction relief, which petition challenged his conviction of first degree murder, alleging that he was deprived of the effective assistance of counsel. Discerning no error, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Wesley Clark, Nashville, Tennessee, for the appellant, Timothy Roy Bozza.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Janice Norman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

A Davidson County Criminal Court Grant Jury charged the petitioner and a co-defendant, Coy J. Cotham, Jr.,[1] with one count of first degree murder arising out of the shooting death of the petitioner's estranged wife. The petitioner and Mr. Cotham were tried separately with Mr. Cotham's trial occurring first. The petitioner testified at Mr. Cotham's trial, and Mr. Cotham was convicted as charged. *See State v. Coy J. Cotham. Jr., a.k.a. Cory J. Cotham*, No. M2012-01150-CCA-R3-CD, slip op. at 1-2 (Tenn. Crim.

---

[1]     In the indictment, Mr. Cotham was identified as "Coy J. Cotham Jr., a.k.a. Cory J. Cotham." In addition to the first degree murder charge, Mr. Cotham was also charged with one count of especially aggravated robbery.

App., Nashville, July 31, 2014). This court, on direct appeal, summarized the evidence from the petitioner's October 2012 trial:

> [T]he [petitioner] and the victim had a history of disagreements about the final resolution of their divorce. The [petitioner] acknowledged being angry with the victim and not being able to move past it. On two occasions, he made statements to the victim that she perceived as threats, telling her to "be careful, it's coming" and stating he could end the nonsense with a telephone call.
>
> [T]he [petitioner] and Mr. Cotham discussed a crisscross murder scenario in which Mr. Cotham would kill the victim for the [petitioner] and the [petitioner] would kill a man for Mr. Cotham. According to the [petitioner's] statements, he was not serious initially. He said that when he had a later conversation in which Mr. Cotham offered him $10,000 to kill the man, the [petitioner] declined but said that $10,000 sounded good and that he would give the money to Mr. Cotham. The [petitioner] admitted that he told Mr. Cotham one of the victim's worksites, that he knew Mr. Cotham followed the victim on multiple occasions, that he knew Mr. Cotham was waiting for the right opportunity, that he waited to see what Mr. Cotham would do rather than objecting, and that he knew what was likely to happen on August 29. The cell phone records showed numerous calls between Mr. Cotham and the [petitioner] on the date of the homicide. The cell phone location data showed Mr. Cotham near the victim's house around the time of the homicide and Mr. Cotham's and the victim's cell phones in the same locations after the crime. In addition, after the homicide, the [petitioner] was untruthful with the authorities and continued associating with Mr. Cotham in order to avoid arousing suspicion.
>
> . . . [T]he [petitioner] and Mr. Cotham were planning to go to Barbados soon, and information from a computer . . . showed research on obtaining a passport and on countries without extradition treaties, including Barbados. Mr. Cotham's Facebook postings indicated that on August 19, he

was working to close a couple of business deals that would allow him to vacation in Barbados in September and October and that on August 29 at 11:15 p.m., less than twelve hours after the homicide, he had just closed a deal and was expecting a "sweet payday for the big man." . . . .

. . . .

The [petitioner] also had a financial motive for the victim's death. He was the beneficiary of her $550,000 life insurance policy and filed an insurance claim three days after her death. The victim would have been permitted to designate a different beneficiary when the divorce became final. The [petitioner] told the police the divorce would have been final about three weeks after the date of the victim's death. The [petitioner] was having financial difficulties and had applied for a large loan. He planned to use the loan proceeds to finance business endeavors with Mr. Cotham involving purchasing and selling sports jerseys and starting an adult website.

*State v. Timothy Roy Bozza*, No. M2013-02537-CCA-R3-CD, slip op. at 16-17 (Tenn. Crim. App., Nashville, Jan. 28, 2015). The jury convicted the petitioner as charged, and the trial court imposed a life sentence. *Id.*, slip op. at 1. This court affirmed the petitioner's conviction on direct appeal, *id.*, and our supreme court denied permission to appeal.

The petitioner filed a timely pro se petition for post-conviction relief,[2] and the post-conviction court appointed counsel. The petitioner filed two amended petitions, alleging the ineffective assistance of trial counsel. Among his claims against trial counsel, the petitioner asserted that counsel failed to properly investigate the case, failed to adequately communicate with him, and failed to object to certain hearsay testimony.

At the May 23, 2018 evidentiary hearing, the petitioner testified that he initially retained trial counsel, but after the petitioner's arrest, the court appointed trial

---

[2]    In its preliminary order, the post-conviction court noted that the court could not locate the petitioner's pro se petition but that the CJIS computer system reflected that the petitioner timely filed the petition on April 20, 2016. The court accepted the computer entry as proof that the petitioner properly filed his petition and appointed counsel.

-3-

counsel to continue representation. The petitioner stated that trial counsel advised and encouraged him to speak with law enforcement officers when the petitioner was taken to the police station, but counsel did not discuss with him the benefits or risks of doing so. Trial counsel advised the petitioner "just to tell the truth" despite having not discussed the specifics of the case with the petitioner. The petitioner stated that he met with law enforcement officers and prosecutors several times with trial counsel present during those meetings. The petitioner was not aware of any defense strategy and the result at trial "[w]as that we had no defense."

The petitioner recalled that he asked trial counsel to investigate, among other things, witnesses who had made statements and video surveillance footage from "the place I was at, at the time of the event." He could not identify any specific witness he wished counsel to investigate. The petitioner contended that counsel did not investigate the case at all. The petitioner acknowledged that trial counsel provided him with discovery materials approximately six months after the petitioner's arrest; however, the petitioner denied that counsel reviewed those materials with him. The petitioner recalled meeting with a private investigator on three occasions, and, although the investigator brought an audio recording to the petitioner, the petitioner "didn't even get to listen to it." The petitioner stated that he did not understand the evidence against him or the trial process. The petitioner contended that trial counsel's defense position was for the petitioner to testify against Mr. Cotham and "hope for the best."

The petitioner described a meeting with trial counsel in which counsel was acting "[n]ervous" and "always seem[ing] to be hyper as we spoke, constantly moving." In that meeting, counsel began talking about the case, but "[q]uickly thereafter, it changed into more personal discussions of [trial counsel's] finances, his wife, his marriage."

The petitioner testified that trial counsel did not explain to him the State's position on the petitioner's testifying and proffering statements against Mr. Cotham or that those statements could also be used against the petitioner. As related to the petitioner's testimony at Mr. Cotham's trial, the petitioner stated, "I thought that there was going to be a series of questions that I'd been prepped on, and it was my understanding that I would be taking the stand and those questions would be asked of me and I would respond in the form that we had discussed." According to the petitioner, trial counsel did not meet with him to prepare for his testimony in Mr. Cotham's trial other than in a meeting that included the district attorney and several other people. The petitioner maintained that counsel did not explain any of the risks of his cooperating with the State, including that any discrepancy between his proffered statement and testimony

-4-

could be used against him. The petitioner stated that he did not sign a proffer agreement with the State.

The petitioner said that, after he proffered statements to the State, he was unable to contact trial counsel, stating that he "just absolutely could not get a response from [trial counsel], whether it be in writing or it be a phone call from the counselor's office at the jail house or it be a response to family members calling." The petitioner reported that he "became the most concerned when I found out that [trial counsel] had just picked up and left the office" where the petitioner had previously met with him and had "moved somewhere else and we couldn't locate him." The petitioner stated that he was unable to contact trial counsel for approximately 15 months and that counsel did not meet with him during status hearings. After not hearing from counsel for 15 months, the petitioner moved for counsel to withdraw from the case, but the court denied the motion. The communication between counsel and the petitioner did not improve after the motion hearing. In describing his relationship with trial counsel, the petitioner said, "[I]t really wasn't very much of a relationship. In fact, it was bad enough that we had spoken to another attorney who . . . came before the judge and asked to be the replacement" counsel.

Prior to trial, the petitioner had a hearing on the admissibility of the testimony of Judge Phillip Robinson who had previously represented the petitioner's wife in the divorce. The petitioner stated that the trial court judge "made clear that Mr. Robinson's testimony could have been highly construed as hearsay" and that six times the court gave trial counsel "the opportunity to object to it and have it considered to be hearsay," but counsel never objected, and the court "finally said well, we're going to admit it then."

The petitioner was concerned about counsel's performance at trial, describing counsel's demeanor as "someone who had too much caffeine." The petitioner asserted that some of counsel's questions during trial "were quite incoherent" and that counsel "seemed to be fixated on one thing, as it was a sunny afternoon and were people out in their yard mowing their grass in the neighborhood, seemed to be one of his go-to questions for everybody that he spoke to." The petitioner was also concerned that counsel's "closing arguments were all over the place and seemed confusing." Additionally, a "couple of times, [counsel] offered to try and put some evidence into exhibit and then ended up apologizing for his confusion to the Court and just -- I didn't feel good at all throughout it."

During cross-examination, the petitioner acknowledged that, when he gave the first interview to police, trial counsel had not arrived, stating "[w]e were waiting on

him to show up. He had been called a couple of times . . . ." The petitioner stated that when he gave his first proffered statement, he had not received any explanation of his rights or been told that he possibly could receive favorable consideration from the State for his cooperation. The petitioner recalled that there was discussion of this being a death penalty case, but he said that, at some point after his first proffered statement, the prosecutor "told me that it wouldn't be offered in my case."

The petitioner clarified that the police had obtained video surveillance footage related to the petitioner's whereabouts at the time of the victim's murder but that he had wanted trial counsel to obtain certain audio recordings. The petitioner acknowledged that no witnesses that he wanted counsel to call at trial were present at the evidentiary hearing.

The petitioner stated that the 15-month period during which he could not contact trial counsel was the "early part of 2011 throughout the summer of 2012, going into Fall." The petitioner acknowledged that during that period, he had actually spoken with counsel "quite a few times when we were meeting" with prosecutors and that counsel had visited him at the jail, but the petitioner contended that he "could not get the kind of contact that we required."

The petitioner acknowledged that he gave three proffered statements and was "[s]ometimes" allowed to meet with trial counsel prior to giving those statements. The petitioner also had three meetings with prosecutors to prepare for the petitioner's testimony at Mr. Cotham's trial, and trial counsel was present during those meetings. The petitioner had an opportunity to speak with trial counsel at those meetings "[s]ome of the time." The petitioner recalled a meeting with trial counsel and the petitioner's uncle in which the petitioner asked counsel to make a plea offer to the State, but the petitioner stated that he never received a plea offer from the State.

Trial counsel testified that the petitioner retained him the day after the homicide before the petitioner was indicted, and together they visited the crime scene and collected pieces of correspondence between the victim and another man and an insurance policy. Trial counsel pointed out that the State appointed two prosecutors to this case before any indictment was issued, which counsel explained was unusual and signaled the likelihood that the State would pursue the death penalty. Trial counsel stated that the petitioner told him that he had had an "epiphany" and asked him to arrange a meeting with the prosecutor "as soon as we could." The petitioner only "[b]riefly" told counsel what he wanted to discuss with the prosecutor. Counsel said that he explained to the petitioner that he could be charged in this case and would potentially face the death penalty. When asked whether he explained the risks of the petitioner's talking to the

prosecutor, trial counsel responded: "I mean [the petitioner's] smart. I mean there's no question about that. You know. He has a good grasp of, you know, all the things. As far as what's going to happen and, you know, the process, you know, I explained that." Counsel also advised the petitioner to be truthful.

Counsel was present with the petitioner during his meeting with the prosecutor. During that meeting, counsel did not expect the petitioner to admit to his involvement in the victim's killing because "it wasn't all out on the table." During the meeting and after the petitioner had made incriminating statements to the prosecutor, the petitioner asked to meet with counsel privately, and the petitioner "told [counsel] a little bit more about it, more that I believe came to him in the epiphany." Trial counsel arranged four or five other meetings between the petitioner and the prosecutor. Trial counsel explained that his primary goal in these meetings was for the petitioner to avoid the death penalty. Trial counsel explained that these meetings took place at the "murder squad" rather than at the jail.

Trial counsel recalled that when the petitioner testified at Mr. Cotham's trial, things "got to be a little bit adversarial," and the petitioner's testimony differed from the recorded statements he made during his meetings with the prosecutor.

At some point after Mr. Cotham's trial, counsel met with the petitioner and the petitioner's uncle to discuss an offer from the State for the petitioner to plead guilty to second degree murder with a 40-year sentence. Counsel included the petitioner's uncle in the discussion because the petitioner had been disinclined to accept the offer, and counsel hoped that the petitioner's uncle could help the petitioner understand the risks of going to trial. Counsel reviewed all discovery materials and the transcript from Mr. Cotham's trial with the petitioner. Trial counsel explained that "there wasn't the best opportunity" to interview witnesses that the petitioner identified because the petitioner had already testified at Mr. Cotham's trial and "there wasn't really any dispute as to some of what happened." Trial counsel also said that the petitioner failed to identify any witnesses whose testimony would have benefited the defense.

Trial counsel described his defense strategy as centering on disputing the petitioner's mental state and "whether or not what happened was the result of [the petitioner's] knowledge" and to argue that a reasonable person would not expect Mr. Cotham to act on the petitioner's statements about killing the victim. The petitioner did not ask counsel to pursue any other defense strategy. At some point, the petitioner became dissatisfied with counsel's representation, with his primary complaint being that counsel "should be visiting him more." Counsel estimated that he met with the petitioner "probably at least thirty or so times" leading up to the trial, and the times that counsel

visited the petitioner at the jail were recorded in the jail visitation record, which was exhibited to counsel's testimony.

Trial counsel recalled that, at the petitioner's trial, the court held a jury-out hearing to determine the admissibility of Judge Phillip Robinson's testimony. Counsel objected to the admission of that testimony during the hearing but did not otherwise make objections to it during trial.

During cross-examination, trial counsel acknowledged that he was not certified as a capital case attorney, but he maintained that he was able to properly advise the petitioner in this case despite the potential for the State to seek the death penalty. Counsel testified that the petitioner was very intelligent, and counsel believed that the petitioner was able to understand the nature of the charges and the evidence against him. Counsel gave the petitioner a copy of the Tennessee Criminal Trial Handbook, and the petitioner was able to read the handbook and ask counsel specific questions about his trial preparation.

Counsel testified that he did not ask the petitioner what he intended to say to the prosecutor when the petitioner asked for counsel to arrange a meeting after his "epiphany." Counsel asserted that it was not important that he knew what the petitioner intended to say rather, it was important only that he advised the petitioner "to tell the truth no matter what." Counsel acknowledged that the petitioner's statements could be used against him but stated that they could also be "used for him." When asked whether he advised the petitioner that his statements could be used against him, counsel responded, "Well, like I said, I don't specifically recall one way or the other. But, you know, what he was going to say, you know, from the epiphany, I left shortly in that conversation because he wanted to get a meeting." Counsel stated that he "very possibly could have talked to him about it," but he could not specifically recall.

Counsel recalled that the State made the plea offer sometime after Mr. Cotham's trial, and counsel relayed the offer to the petitioner and discussed with him the risks of going to trial. Trial counsel stated that he gave the petitioner a copy of the transcripts from Mr. Cotham's trial, but he could not recall whether he reviewed the transcripts with him. Counsel acknowledged that he moved the location of his office during his representation of the petitioner, but he stated that the petitioner knew how to contact him despite the move.

Trial counsel maintained that his defense strategy was to argue that the petitioner did not have the proper mental state to commit the charged offense and that the petitioner's statements to Mr. Cotham about killing the victim were made in jest and were

based on the film "Throw Mama from the Train." Counsel said that he did not seek a mental evaluation of the petitioner because "it would be a waste of time. He's not deficient." Counsel acknowledged that there were facts in evidence that were harmful to the defense and many facts "were pretty much undisputed," but he reiterated that he sought to show that a reasonable person would not take the petitioner's statements to Mr. Cotham as intent to have the victim killed.

Tom Thurman, the deputy district attorney for Davidson County who investigated and prosecuted this case, testified that this case was considered a potential death penalty case from the beginning and that the death penalty was not taken off the table until after the petitioner gave statements to the prosecutors. Mr. Thurman testified that he agreed to give the petitioner an opportunity to be heard after trial counsel indicated that the petitioner wanted to talk. According to Mr. Thurman, the petitioner did not admit his participation in the victim's murder in the first interview other than acknowledging that Mr. Cotham had called him after the victim's death and told him it was done. Mr. Thurman stated that trial counsel seemed "kind of shocked" at the petitioner's statement, and counsel spoke privately with the petitioner at that point. Mr. Thurman stated that in each subsequent interview, the petitioner "would come up with a little bit more information indicating his guilt." Mr. Thurman stated that the State's intent with these meetings was "to turn [the petitioner] to testify against [Mr.] Cotham, who we knew was the trigger man." Mr. Thurman believed that trial counsel's goal in the meetings was to have the death penalty or life without parole taken off the table in exchange for the petitioner's cooperation. Mr. Thurman recounted several meetings that he had with trial counsel to provide him with all of the State's evidence against the petitioner.

In its written order denying post-conviction relief, the post-conviction court found that trial counsel had moved to exclude Judge Robinson's testimony, and the matter was addressed pretrial. The court also found that the petitioner had received all discovery materials. Because the petitioner failed to name any witness that trial counsel failed to call, the court concluded that the petitioner could not show that trial counsel performed deficiently on that matter. The court determined that the petitioner failed to show that he was prejudiced by counsel's actions in preparation for his testimony at Mr. Cotham's trial. Finally, the post-conviction court accredited Mr. Thurman's testimony that he had reviewed all of the State's evidence with trial counsel, and the court accredited trial counsel's testimony that he had met with the petitioner more than 30 times.

In this timely appeal, the petitioner argues that trial counsel performed deficiently by failing to advise him not to talk to police, failing to investigate the case and

communicate with the petitioner, and failing to object to Judge Robinson's testimony on hearsay grounds. The State contends that the petitioner waived our review of the first and second issues by changing the theory of relief from his post-conviction petitions.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citation omitted), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App.

1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

As an initial matter, we address the State's contention that the petitioner has waived certain issues. Post-conviction relief is unavailable for a claim that has been waived for failure "to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." T.C.A. § 40-30-106(g). Instances of ineffective assistance of counsel, however, are deemed to constitute a single rendering of ineffective assistance. *Thompson v. State*, 958 S.W.2d 156, 161 (Tenn. Crim. App. 1997) ("Ineffective assistance of counsel is generally 'a single ground for relief' under the post-conviction statute." (citing *Cone v. State*, 927 S.W.2d 579, 581-82 (Tenn. Crim. App. 1995))). Contrary to the State's assertion, the petitioner did indeed raise the specific instances of deficient performance in his amended petitions that he raises in this appeal. Because the petitioner raised a broad claim of ineffective assistance of counsel in his amended petitions and, more importantly, specifically raised and presented proof on these specific alleged deficiencies at the evidentiary hearing, these issues are not waived.

Turning to the merits of the petitioner's claim, we conclude that he has failed to prove by clear and convincing evidence sufficient facts to support his claim that trial counsel's representation was deficient. First, the petitioner asserts that trial counsel should have advised him not to talk with law enforcement officers and prosecutors. Although the petitioner complains about counsel's inadequate advice to him prior to his proffering statements to the State, the petitioner has failed to demonstrate any prejudice in this matter. We cannot say that counsel performed deficiently by advising the petitioner to cooperate with the State in light of the petitioner's facing the possibility of the death penalty. The petitioner presented no proof that he would not have cooperated with the State had counsel advised him that his statements could be used against him, and, consequently, he cannot prevail on this claim.

Next, the petitioner contends that trial counsel failed to thoroughly investigate the case or adequately communicate with him. Counsel's accredited testimony, however, establishes that he met with the petitioner at least 30 times leading up to the petitioner's trial. Mr. Thurman's accredited testimony established that trial counsel received all of the evidence against the petitioner, and the petitioner acknowledged that he had received all of the discovery materials. The petitioner failed to present any evidence or witnesses that counsel could have discovered with further investigation. Consequently, the petitioner has failed to show that he was prejudiced by counsel's actions. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)

-11-

("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing.").

Finally, the petitioner argues that trial counsel performed deficiently by failing to object to Judge Robinson's testimony as hearsay. The record supports the post-conviction court's finding that trial counsel did in fact move to exclude Judge Robinson's testimony on hearsay grounds and that the trial court held a jury-out hearing to determine the admissibility of Judge Robinson's testimony and found the statements admissible as hearsay exceptions. Consequently, the petitioner has failed to show that counsel performed deficiently on this matter.

Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE